[Cite as *State v. Brown*, 2013-Ohio-5112.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

STATE OF OHIO

    Appellee

v.

MICHAEL E. BROWN

    Appellant

C.A. No.     26490

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 11 03 0741

DECISION AND JOURNAL ENTRY

Dated: November 20, 2013

BELFANCE, Presiding Judge.

{¶1}   Defendant-Appellant Michael E. Brown Jr. appeals from the judgment of the Summit County Court of Common Pleas. For the reasons set forth below, we affirm in part, reverse in part, and remand the matter for further proceedings.

I.

{¶2}   Based upon events that took place on March 19, 2011, Mr. Brown was indicted on one count of retaliation in violation of R.C. 2921.05(A), a third-degree felony, one count of resisting arrest in violation of R.C. 2921.33(A), a second-degree misdemeanor, one count of disorderly conduct in violation of R.C. 2917.11(A)(1), a fourth-degree misdemeanor, and one count of aggravated menacing in violation of R.C. 2903.21, a first-degree misdemeanor. The case proceeded to a jury trial after which the jury found Mr. Brown guilty of all counts. Mr. Brown was sentenced to an aggregate term of two years in prison.

{¶3}   Mr. Brown has appealed, raising two assignments of error for our review.

II.

ASSIGNMENT OF ERROR I

APPELLANT MICHAEL E. BROWN'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶4}   Mr. Brown asserts in his first assignment of error that his convictions are against the manifest weight of the evidence.  We do not agree.

{¶5}   In reviewing a challenge to the weight of the evidence, the appellate court

> [m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶6}   All the charges at issue stem from events that took place on March 19, 2011, and center around Mr. Brown and his interactions with Officer Howard Vaughn of the Akron Police Department.  Officer Vaughn and Mr. Brown were acquainted with each other from high school, but the two men did not have any difficulties with each other until February 2000.

{¶7}   Officer Vaughn testified at trial and discussed his various interactions with Mr. Brown.  On February 19, 2000, after Officer Vaughn had finished his shift, he received a phone call from Geeya Gibson, who was a friend of his best friend's wife and was also the mother of Mr. Brown's son.  Ms. Gibson was concerned that someone had broken into her car and knew Officer Vaughn was a police officer.  Officer Vaughn went over to investigate.  While he was doing so, Ms. Gibson saw Mr. Brown's vehicle and became afraid.  She told Officer Vaughn to go inside her house because she did not know what Mr. Brown would do if he saw Officer Vaughn.  Mr. Brown came to the door and began yelling at Ms. Gibson, telling her to have her visitor come outside.  Mr. Brown also threatened to shoot Officer Vaughn's truck.  Officer

Vaughn decided to call dispatch to report the situation. After a few minutes, Officer Vaughn went to the door and asked Mr. Brown what the problem was. Realizing that Ms. Gibson's visitor was Officer Vaughn, Mr. Brown expressed his dislike for him. Mr. Brown then walked to his vehicle and pulled out a gun. Officer Vaughn proceeded to pull out his gun and identified himself as a police officer; however, Mr. Brown got into his car. At the time, Ms. Gibson's young son was begging Officer Vaughn not to shoot his father. As Mr. Brown was driving away, he told Officer Vaughn that they could settle the argument later at a local school.

{¶8} As a result of that incident, Mr. Brown was charged and an arrest warrant was issued. Sometime later, Officer Vaughn and his partner went to Mr. Brown's home to effectuate the warrant. They placed Mr. Brown in handcuffs, but, after running a computer search, realized that Mr. Brown had turned himself in earlier that morning. Accordingly, they released Mr. Brown.

{¶9} Officer Vaughn next encountered Mr. Brown on June 18, 2006. Officer Vaughn was stopped at a light on his way home from church when Mr. Brown's vehicle pulled up next to his. Mr. Brown was laughing and told Officer Vaughn that he was still "going to kick [Officer Vaughn's] a\*\*." Officer Vaughn then drove away after making a comment to Mr. Brown.

{¶10} On August 4, 2007, Officer Vaughn and another officer were in uniform working an off-duty job at a liquor store. Officer Vaughn was standing in front of the store keeping an eye on the parking lot when Mr. Brown walked into the store and swore at Officer Vaughn. When Mr. Brown left the store, he again threatened Officer Vaughn with physical harm. Because Mr. Brown was blocking the entrance to the store and being disorderly, Officer Vaughn told Mr. Brown that he had to leave. Mr. Brown seemed unconcerned and continued through the parking lot cursing at Officer Vaughn. As Mr. Brown got in his vehicle, he told Officer

Vaughn that Mr. Brown was "going to destroy [him]." The other officer who was present testified similarly; however, he did not report that Mr. Brown threatened Officer Vaughn. At that point, Officer Vaughn arrested Mr. Brown, and he was later charged and tried in Akron Municipal Court by Judge Williams.

{¶11} Officer Vaughn again encountered Mr. Brown in March 2011. Events from that day led to the charges at issue in the instant matter. Officer Vaughn had gone to Acme to drop off some pants to be altered. Officer Vaughn happened to park next to Mr. Brown's vehicle in the Acme parking lot. As Officer Vaughn walked in front of Mr. Brown's vehicle, Mr. Brown began swearing at Officer Vaughn. Officer Vaughn told Mr. Brown that he was praying for him and walked away. Mr. Brown followed Officer Vaughn and continued to yell at him. Mr. Brown told Officer Vaughn that he was "going to spray [Officer Vaughn's] house with bullets." Officer Vaughn asked if Mr. Brown was threatening him, and Mr. Brown indicated he was. Mr. Brown added that there was nothing that Judge Williams could do about it and walked away into the store. Officer Vaughn walked in behind Mr. Brown and proceeded to call the police. Officer Vaughn testified that he has been afraid that Mr. Brown will carry out his threats against his family and has taken various measures in attempts to ensure his family's safety. Because Mr. Brown confronted Officer Vaughn with a gun on a prior occasion and because Mr. Brown knows where Officer Vaughn lives, Officer Vaughn took Mr. Brown's threats seriously. Police officers eventually arrived at the scene, but Mr. Brown had already left. Charges were filed against Mr. Brown, but Officer Vaughn did not participate in the arrest because he did not want to further aggravate the situation with Mr. Brown.

{¶12} Nevin Webb, an officer with the Akron Police Department, also testified at trial. He responded to the Acme parking lot following the incident with Officer Vaughn and Mr.

Brown. When he arrived, Mr. Brown was already gone, so he and other officers proceeded to try to locate Mr. Brown pursuant a felony arrest warrant issued against him. Ultimately, Officer Webb responded to 1119 Garman. Officer Webb knocked on the door, but there was no response. When he noticed a person inside the residence peering out a window, he called for backup. Eventually, the person came outside, shut the door, and identified himself as Mr. Brown. Officer Webb asked Mr. Brown to tell him what happened at the Acme, but Mr. Brown became more agitated and began using expletives and made threats against the police, in general, and against Officer Vaughn specifically. At that point, Officer Webb told Mr. Brown that he was under arrest. Mr. Brown became more angry and told Officer Webb that he had to go back into the house for something. Mr. Brown then turned to open the door and go back inside. Officer Webb was afraid that Mr. Brown was about to barricade himself inside, and, therefore, grabbed Mr. Brown's wrist and pulled him into the yard. Mr. Brown lost his balance and, when he got up, he was even more upset; he began clenching his fists and "blad[ed]" his body "like he was ready to fight." Mr. Brown continued throughout the arrest to yell expletives and at one point yelled that he was not going to be arrested. During this time, Officer Webb repeatedly told Mr. Brown to get on the ground and that he was under arrest. When Officer Webb saw an opportunity, he tackled Mr. Brown, and, at that time, Officer Harrison arrived and assisted with handcuffing Mr. Brown. Officer Webb denied hitting or kicking Mr. Brown.

{¶13} Officer Joel Harrison testified that, when he arrived on the scene at 1119 Garman, he observed Officer Webb and Mr. Brown standing in the yard facing each other. Officer Harrison heard Officer Webb tell Mr. Brown to get on the ground and saw Mr. Brown take "a fighting stance[.]" Within seconds, Officer Webb tackled Mr. Brown, and Officer Harrison proceeded to assist Officer Webb in arresting him. Mr. Brown continued to struggle to avoid

being handcuffed despite being told to stop resisting. Ultimately, the two officers were able to handcuff Mr. Brown and place him in the cruiser. A sergeant of the Akron Police Department who investigated the officers' use of force recommended that it be found reasonable. The sergeant interviewed several people including Mr. Brown, his wife, and a witness and concluded that the officers did not hit or kick Mr. Brown.

{¶14} Mr. Brown disputed Officer Vaughn's and Officer Webb's version of events and presented witnesses in support of his position. With respect to the 2000 incident, Ms. Gibson testified that Officer Vaughn came over her house to visit but denied that she called him over to investigate a break-in involving her car. She indicated that Mr. Brown then came over and began knocking at the door, but she did not answer hoping he would leave. Ms. Gibson denied that her son was present. Mr. Brown testified that he had come over to retrieve something from Ms. Gibson's house but no one answered the door. It was only as he was leaving that Officer Vaughn came outside, made a statement to Mr. Brown, and started jumping around, yelling, and waving his gun in the air. Ms. Gibson confirmed that she overheard Mr. Brown and Officer Vaughn arguing. Mr. Brown testified that he then got in his car and left while Officer Vaughn was in the street screaming. Mr. Brown called Ms. Gibson to talk to her about what happened, but Officer Vaughn grabbed the phone. Mr. Brown told Officer Vaughn that they could settle the dispute in a schoolyard. Mr. Brown also indicated that, when Officer Vaughn came to arrest him regarding this incident, Officer Vaughn put a gun to his head and ordered him to the ground.

{¶15} With respect to the 2007 encounter, Mr. Brown maintains that he walked in and out of the liquor store without speaking to Officer Vaughn and that it was Officer Vaughn that followed Mr. Brown to his vehicle. Mr. Brown told Officer Vaughn he was going to call his lawyer, and Officer Vaughn told Mr. Brown he was being disorderly. Mr. Brown was then

arrested and charged.  Mr. Brown testified to his attempts to try to clear himself of those charges even after being convicted.  These efforts included writing letters to the disciplinary committee, the mayor's office, various judges, and newspapers.

{¶16}  Mr. Brown also discussed the 2011 incident at Acme.  Mr. Brown testified that he was going to Acme to buy coffee cleaner and was sitting in his car smoking when Officer Vaughn pulled up next to him.  According to Mr. Brown, Officer Vaughn walked up to Mr. Brown's vehicle, stopped, beat his chest, kissed his fingers, pointed to the sky, and told Mr. Brown he was praying for him.  Mr. Brown took that as a threat in response to Mr. Brown's actions to clear his name from the 2007 convictions.  Mr. Brown got out of the car and swore and told Officer Vaughn that he should be praying for himself.  As they were walking in the store, Mr. Brown told Officer Vaughn that he was going to sue him.  Mr. Brown denied mentioning Judge Williams and denied threatening Officer Vaughn.  Mr. Brown bought the coffee cleaner and went back home.  Upon arriving home, Mr. Brown told his wife about running into Officer Vaughn in the parking lot.  Mr. Brown's wife indicated that this made her concerned given the prior incidents between Mr. Brown and Officer Vaughn.

{¶17}  A while later, Mr. Brown heard knocking at the door.  When he answered it there was an officer standing there who began asking Mr. Brown about the Acme incident.  After a brief conversation, the officer indicated Mr. Brown was under arrest.  Mr. Brown told the officer he wanted to tell his wife and turned towards the door to do so and at that point was tackled by the officer.  Mr. Brown asserted that the officer then started hitting him.  Mr. Brown proceeded to get up, and the officer lost his balance.  Mr. Brown indicated that he then put his hands up because the officer appeared to be reaching for a weapon, but the officer charged him anyway and tackled him.  While the officer repeatedly told Mr. Brown to stop resisting, Mr. Brown kept

insisting that he was not resisting. At that point another officer arrived and also jumped on top of Mr. Brown. Ultimately, Mr. Brown was handcuffed and placed in a cruiser. Mr. Brown's wife testified that, during the arrest, Mr. Brown kept saying that he was not resisting and stated that she never saw Mr. Brown taking a fighting stance. While he was in a cruiser, Officer Jeffrey Ludle came over to Mr. Brown. Officer Ludle told Mr. Brown that he and Officer Vaughn should settle their differences in a fight and also told Mr. Brown that, if he did not stop behaving as he was, Officer Vaughn would end up shooting him someday. Officer Ludle also expressed a similar sentiment to Mr. Brown's wife.

{¶18} After a thorough review of the record, we cannot say that the jury lost its way in convicting Mr. Brown of the charged offenses. The majority of Mr. Brown's argument focuses on credibility issues; notably, Mr. Brown does not generally assert, unless otherwise noted, that, if it was reasonable to believe the State's witnesses' testimony, the evidence would not support a conviction under the charged offenses. Mr. Brown was convicted of retaliation in violation of R.C. 2921.05(A), which provides that

> [n]o person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against a public servant, a party official, or an attorney or witness who was involved in a civil or criminal action or proceeding because the public servant, party official, attorney, or witness discharged the duties of the public servant, party official, attorney, or witness.

"A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). Additionally, Mr. Brown was found guilty of aggravated menacing in violation of R.C. 2903.21(A). R.C. 2903.21(A) states that "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of

the other person, the other person's unborn, or a member of the other person's immediate family."

{¶19} With respect to these two convictions, Mr. Brown essentially asserts that his version of events is more believable than Officer Vaughn's and that Officer Vaughn's testimony concerning the early incidents between himself and Mr. Brown further undermines his credibility as that testimony is also not believable. For example, Mr. Brown points out that not only does Mr. Brown's testimony contradict Officer Vaughn's testimony concerning the 2000 encounter, but so does Ms. Gibson's.

{¶20} Due to the nature of this case, credibility determinations clearly played a critical role in the jury reaching the outcome in this matter. At trial, the trier of fact is able to assess the demeanor of witnesses and evaluate their testimony as they testify in open court. *See State v. Andrews,* 9th Dist. Summit No. 25114, 2010-Ohio-6126, ¶ 28 ("The jury was able to observe the witnesses' demeanor during extensive testimony and use these observations to weigh the credibility and resolve the conflicts in the testimony."). Hence, a verdict is not against the manifest weight of the evidence where the jury's resolution of credibility is reasonable and where the jury ultimately chose to believe the State's witnesses as opposed to defense witnesses. *Id.* In this case, we cannot say that the jury lost its way in finding Officer Vaughn's version of events more credible than Mr. Brown's. Mr. Brown clearly presented a different version of the various interactions he had with Officer Vaughn. Notably, he denied threatening to shoot at Officer Vaughn's house and denied mentioning Judge Williams at the Acme in reference to his 2007 convictions. However, we note that Officer Vaughn's call to dispatch references both facts. While it is possible that Officer Vaughn could have fabricated those facts, the jury, in assessing his credibility, could have reasonably found that, because Officer Vaughn reported that

information to dispatch so close in time to the incident, his version of events was more credible. Thus, a jury could have reasonably inferred from the circumstances that Mr. Brown was threatening Officer Vaughn in response to Officer Vaughn's actions of arresting him in 2007 and then testifying against him at a criminal proceeding; actions which resulted in Mr. Brown' s prior convictions. Moreover, at the time Mr. Brown was threatening to shoot at Officer Vaughn's house, Officer Vaughn stated that Mr. Brown referred to Judge Williams, who was the judge that presided over that case. The jury also heard Mr. Brown's own testimony that he feels strongly that he was wrongly convicted for the events that happened in 2007. It also heard that Mr. Brown utilized non-criminal mechanisms to address his concerns about those convictions, such as writing letters and filing complaints. Contrary to Mr. Brown's suggestion, even if the jury believed he engaged in appropriate conduct, such does not require the conclusion that Mr. Brown would not resort to illegal means to express his outrage. A trier of fact could reasonably find that someone with such strong feelings would perhaps be more likely to threaten the person that he felt led to his wrongful convictions. Accordingly, Mr. Brown's convictions for retaliation and aggravated menacing are not against the manifest weight of the evidence.

{¶21} Mr. Brown also asserts that his conviction for resisting arrest is against the manifest weight of the evidence. R.C. 2921.33(A) states that "[n]o person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another." Mr. Brown again asserts that his version of the events at his house is more credible than that of the officers. We cannot say the jury was unreasonable in crediting the officers' testimony over Mr. Brown's. We note that, while Mr. Brown claimed that Officer Webb hit him during the arrest, the sergeant who investigated the use of force concluded that the officers did not hit or kick Mr. Brown and recommended that their use of force be declared reasonable. Notably, the sergeant interviewed a

neighbor, whom the sergeant indicated corroborated the officers' version of events. The jury could have found this testimony important in concluding that the officers' testimony was more reliable than Mr. Brown's. While Mr. Brown denies that he took a fighting stance or clenched his fists and denies that he resisted at all, there was evidence from which a jury could conclude that Mr. Brown was in fact resisting a lawful arrest. We cannot say that the fact that the jury found this evidence more compelling was unreasonable.

{¶22} Finally, Mr. Brown challenges his conviction for disorderly conduct. We note that it is somewhat unclear from the record at trial at which location the State maintained that the disorderly conduct took place: at the Acme or at Mr. Brown's house during the arrest. We note that, on appeal, Mr. Brown and the State focus on conduct that took place during the arrest, and, thus, that is where we will also focus our analysis.

{¶23} R.C. 2917.11(A)(1) provides that "[n]o person shall recklessly cause inconvenience, annoyance, or alarm to another by * * * [e]ngaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior[.]" Pursuant to R.C. 2917.11(E)(3), "[d]isorderly conduct is a misdemeanor of the fourth degree if * * * [t]he offender persists in disorderly conduct after reasonable warning or request to desist." "The Supreme Court has defined turbulent behavior as 'tumultuous behavior or unruly conduct characterized by violent disturbance or commotion.'" *State v. Graham,* 9th Dist. Wayne No. 98 CA 0007, 1998 WL 887151, *3 (Dec. 16, 1998), quoting *State v. Reeder,* 18 Ohio St.3d 25, 27 (1985).

{¶24} It is clear that the jury found Officer Webb's and Officer Harrison's testimony credible, and, after reviewing the record, we cannot say that the jury's credibility determination was unreasonable. Once outside his house, Mr. Brown became very agitated while talking to

Officer Webb. According to Officer Webb, Mr. Brown made threats against the police and against Officer Vaughn. Even after Officer Webb told Mr. Brown he was under arrest, Mr. Brown proceeded to try and reenter his house, an act Officer Webb viewed as possibly an attempt to barricade himself inside or obtain a weapon. When Mr. Brown was pulled to the ground, he got up and took a stance that the officers described as a fighting stance. Mr. Brown was repeatedly told to stop resisting and to get on the ground; yet, Mr. Brown at one point told Officer Webb that he was not going to be arrested. Such behavior could be reasonably perceived as threatening and violent in nature. *See State v. Hagstrom,* 12th Dist. Butler No. CA98-07-157, 1999 WL 527785, \*6 (June 21, 1999). While Mr. Brown asserts the evidence does not support a conviction for persistent disorderly conduct after a reasonable warning to desist, we conclude the totality of the testimony discussed above could allow a jury to conclude that Mr. Brown's turbulent behavior continued after warnings to desist. Accordingly, we cannot say that Mr. Brown's conviction for persistent disorderly conduct is against the manifest weight of the evidence.

{¶25} In sum, all of Mr. Brown's arguments essentially focus on the credibility determinations. As noted above, this Court has frequently stated that the trier of fact is in the best position to make credibility determinations. *See, e.g., State v. Campanalie,* 9th Dist. Summit No. 26383, 2013-Ohio-3509, ¶ 21. After reviewing the record, we cannot say that the jury lost its way in doing so. We overrule Mr. Brown's first assignment of error.

ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY FAILING TO CONDUCT A SIMILAR IMPORT ANALYSIS BEFORE SENTENCING BROWN ON ALL COUNTS.

{¶26} Mr. Brown asserts in his second assignment of error that the trial court failed to consider whether any of his convictions merged for purposes of sentencing. The State concedes the error. We agree.

{¶27} In *State v. Johnson*, 128 Ohio St.3d 153, 2010–Ohio–6314, the Ohio Supreme Court held that "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Id*. at syllabus. Subsequent to that decision, this Court has consistently remanded cases for further proceedings in the trial court to apply *Johnson* in the first instance. *See, e.g., State v. Owens,* 9th Dist. Summit No. 25872, 2012-Ohio-3667, ¶ 19. In light of our precedent, it is necessary to remand this matter so that the trial court can apply *Johnson* in the first instance. We sustain Mr. Brown's second assignment of error.

### III.

{¶28} In light of the foregoing, we overrule Mr. Brown's first assignment of error and sustain his second assignment of error. We remand the matter to the Summit County Court of Common Pleas so that it can consider and apply *Johnson.* All other outstanding motions pending before this Court are denied.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

EVE V. BELFANCE
FOR THE COURT

WHITMORE, J.
HENSAL, J.
CONCUR.

APPEARANCES:

JEFFREY N. JAMES, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.